IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TIMOTHY JOHN KRAIG, | ) | CASE NO. 21-CV-01253 |
| | ) | |
| Plaintiff, | ) | DISTRICT JUDGE |
| | ) | PAMELA A. BARKER |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | AMANDA M. KNAPP |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Timothy John Kraig ("Plaintiff" or "Dr. Kraig") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying his

applications for Period of Disability ("POD") and Disability Insurance Benefits ("DIB").  (ECF

Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been

referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to

Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the final decision of

the Commissioner be **AFFIRMED**.

## I.  Procedural History

On November 15, 2019, Dr. Kraig filed applications for DIB and POD.  (Tr. 155, 179.)

He alleged a disability onset date of September 12, 2018.  (*Id*.)  He alleged disability due to major

depressive disorder, generalized anxiety disorder, severe insomnia, and sedative abuse in early

remission.  (*Id*.)  Dr. Kraig's application was denied at the initial level (Tr. 67) and upon

1

reconsideration (Tr. 83), and he requested a hearing (Tr. 103).  On November 13, 2020, a hearing was held before an Administrative Law Judge ("ALJ").  (Tr. 30-60.)

On November 30, 2020, the ALJ issued a decision finding that Dr. Kraig had not been under a disability within the meaning of the Social Security Act from September 12, 2018 through the date of the decision.  (Tr. 9-24.)  On April 23, 2021, the Appeals Council denied Dr. Kraig's request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-3.)  On June 28, 2021, Dr. Kraig filed a Complaint challenging the Commissioner's final decision.  (ECF Doc. 1.)  The parties have completed briefing in the case.  (ECF Docs. 9, 11, 12.)

## II. Evidence

### A.    Personal, Educational, and Vocational Evidence

Dr. Kraig was born in 1955, and was 63 years old on the alleged disability onset date, making him an individual closely approaching retirement age under Social Security Regulations.  (Tr. 23.)  He had at least a high school education.  (*Id.*)  Dr. Kraig has not worked since September 12, 2018, the alleged onset date.  (Tr. 14.)

### B.    Medical Evidence

Although Dr. Kraig has physical medically determinable impairments (Tr. 15), he only challenges the ALJ's determination of his mental RFC in this appeal.  (ECF Doc. 9 p. 3.)  The evidence described herein is accordingly focused on evidence relating to his mental impairments.

#### 1.    Relevant Treatment History

Dr. Kraig met with Cleveland Clinic psychiatrist Michael Primc, M.D. on September 13, 2018, as part of mandated treatment for Ambien addiction after being caught writing Ambien prescriptions for himself.  (Tr. 237.)  Dr. Kraig reported that he had never been in any kind of

inpatient or outpatient treatment, and was consuming Ambien daily.  (*Id*.)  Dr. Primc noted Dr.

Kraig reported a series of traumatic events dating back to 2012:

> While on vacation his wife suffered a cerebral hemorrhage and died. Fifteen months later he found a close friend after he committed suicide. In 2015 his brother succumbed to an aggressive form of oral cancer. His work as a dentist is very stressful. He suffered deep disappointment after his associate backed away from taking over ownership of the practice. Last October, his son fell into a depression related to a sudden divorce.

(*Id*.)  He also noted Dr. Kraig reported suffering perfectionism and being prone to chronic worry.

(*Id*.)  Mental status examination results were unremarkable, with the exception of anxious mood.

(Tr. 237-38.)  Dr. Primc wrote that Dr. Kraig was caught in a conflict, likely leading to insomnia

and self-prescribing Ambien.  (Tr. 238.)  He diagnosed sedative use disorder (severe), sedative

withdrawal, sleep disorder, insomnia, depression, and generalized anxiety disorder, and

prescribed Lexapro.  (*Id*.)

Dr. Kraig was hospitalized for inpatient detoxification from Ambien at the Cleveland

Clinic from September 12, 2018 to October 10, 2018.  (Tr. 239.)  Discharge notes state: "He

responded favorably to treatment efforts as evidenced by improvement in his overall level of

functioning via his group attendance and participation, lecture and 12-step meeting attendance,

and his cooperation with staff and the treatment program."  (*Id*.)  He was referred to Southwest

General in Akron for intensive outpatient therapy and aftercare.  (*Id*.)

Dr. Kraig participated in various therapy groups as part of intensive outpatient therapy at

Southwest General from November 1, 2018 (Tr. 294) to November 26, 2018 (Tr. 242).  He was

frequently described as "attentive," "engaged," "able to verbalize understanding," and/or

"participat[ing] appropriately."  (Tr. 244, 246, 248, 250, 252, 256, 258, 260, 266, 268, 272, 274,

276, 278, 280, 284, 286, 288, 290, 292, 294.)

On November 15, 2018, Dr. Kraig presented to Saissy Kendig, PMHNP-BC, at Florence

Kimbo, MD LLC for a psychiatric diagnostic evaluation related to medication management

services for symptoms of depression, anxiety, and sleep issues.  (Tr. 367.)  He reported sleeping

six to seven hours, and waking once a night, often to use the bathroom.  (Tr. 368.)  He reported

his anxiety caused him to feel overwhelmed, restless, on edge, and easily irritable.  (*Id*.)  He also

reported racing thoughts, difficult time falling asleep, and decrease in appetite.  (*Id*.)  His

reported depressive symptoms included lack of energy, crying spells, lack of motivation, and

isolation.  (*Id*.)  He reported having good social support and engaging in hobbies including

playing racketball, riding a motorcycle, boating, and spending time with dogs.  (Tr. 371.)  On

examination, he was alert and oriented with anxious mood, appropriate affect, appropriate dress,

good eye contact, clear conversational communication, normal volume, normal recent and

remote memory, open and cooperative attitude, and good judgment. (Tr. 374.)  NP Kendig noted

"moderate" symptoms that included anxiety, worry, daytime fatigue, lack of energy, depressed

mood, difficulty marinating sleep, inappropriate guilt, being on edge, less satisfying social

interactions, and low self-esteem.  (Tr. 373.)  She opined that Dr. Kraig had moderate

impairment in functioning in the following areas: inhibition in social situations, inability to work,

difficulty completing instrumental activities of daily living, and difficulty having fun.  (*Id*.)  She

diagnosed generalized anxiety disorder, sedative abuse with sedative-induced sleep disorder,

insomnia, and major depressive disorder (single episode, mild).  (Tr. 375.)  She increased his

dosage of Doxepin, continued his Lexapro and advised him to return in one month.  (Tr. 376.)

Dr. Kraig returned to NP Kendig on December 13, 2018, and reported he had sold his

practice and hoped this would decrease his anxiety.  (Tr. 378.)  He also reported receiving

outpatient therapy at Oakview one day per week.  (*Id*.)  He continued to report sleeping about

seven hours and waking up once during the night, and asked for an increase in his Doxepin dosage. (*Id*.) He also reported drinking about five large cups of coffee a day, but did not want to decrease his caffeine usage or switch to a different sleep aide. (*Id*.) On examination, he was alert and oriented, with happy, congruent mood, appropriate affect, and fluid, rapid speech. (Tr. 380.) NP Kendig's assessment of his symptoms and functional impairments was unchanged. (Tr. 381.) She continued his medications and advised him to return in three months. (Tr. 384.)

On March 8, 2019, Dr. Kraig met with Sandra Lavelle, PMHNP-BC, at Florence Kimbo, MD LLC. (Tr. 386.) He again reported sleeping about seven hours and waking up once during the night, and asked for an increase in his Doxepin dosage. (*Id*.) However, he also reported experiencing urinary retention at his current dosage, and NP Lavelle decided to continue it unchanged. (*Id*.) He reported his mood had been good and he was enjoying retirement. (*Id*.) He asked about discontinuing Lexapro because he felt "he is in a good place right now." (*Id*.) On examination, he was again alert and oriented, with happy, congruent mood, appropriate affect, no anxiety, and fluid, rapid speech. (Tr. 388.) NP Lavelle's assessment of his symptoms and functional impairments was the same as NP Kendig's prior assessments. (Tr. 388-89.) She continued his current medications and advised him to return in three to four months. (Tr. 392.)

On May 8, 2019, Dr. Kraig returned to NP Lavelle, and reported that he often felt anxious by one o'clock even though he took Lexapro in the morning, and requested additional Lexapro. (Tr. 393.) He also reported that he continued to wake nightly around 2:30 in the morning, and again requested additional Doxepin. (*Id*.) NP Lavelle's mental status findings and assessment of his symptoms and functional impairments was unchanged. (Tr. 395-96.) She continued his dosage of Lexapro but divided it into two pills, increased his dosage of Doxepin for insomnia, and advised him to return in six weeks. (Tr. 400.)

On June 4, 2019, Dr. Kraig returned to NP Lavelle, reporting that his sleep was good and his anxiety was under control.  (Tr. 401, 440.)  He continued to report seven hours of sleep, but waking at least once per night.  (Tr. 402, 441.)  NP Lavelle's mental status findings, and assessment of his functional impairments was unchanged.  (Tr. 402-04, 441-43.)  She continued his medications and advised him to return in three months.  (Tr. 407, 446.)

Dr. Kraig returned to NP Lavelle on September 3, 2019, reporting that he was doing well, staying active, and now taking his full dosage of Lexapro, once a day in the morning.  (Tr. 447.)  He continued to report seven hours of sleep, but continued waking at least once per night.  (Tr. 448.)  NP Lavelle's mental status findings and assessment of his functional impairments was unchanged.  (Tr. 449-50.)  She continued his medications, added Buspirone as needed for afternoon anxiety, and advised him to return in three months.  (Tr. 450, 453.)

On December 20, 2019, Dr. Kraig attended medication management with Stephen Pessefall, PMHNP-BC, reporting that his anxiety was "not too bad," and his mood was "fair."  (Tr. 728.)  NP Pessefall assessed unchanged mental status findings and functional impairments.  (Tr. 728-29.)  He initiated a plan to taper Dr. Kraig off of Doxepin and add Trazodone for insomnia, and advised him to return in four weeks.  (Tr. 735.)

On January 20, 2020, Dr. Kraig reported to NP Pessefall that his anxiety was "not too bad," and his mood was "fair."  (Tr. 738.)  NP Pessefall assessed unchanged mental status findings and functional impairments.  (Tr. 738-39.)  He discontinued Trazodone, restored the prior dosage of Doxepin, continued Lexapro and Buspirone, recommended grief therapy, and advised Dr. Kraig to return in two months.  (Tr. 746.)

Dr. Kraig attended a tele-psych session with NP Pessefall on March 28, 2020.  (Tr. 759.)  He reported a "pretty ok" home life, and said he was happy because his grandson was just born.

6

(*Id*.)  His mood was fair on examination.  (Tr. 760.)  NP Pessefall discontinued Lexapro, recommended grief therapy, and advised him to return in three months.  (Tr. 759, 761.)

On August 29, 2020, Dr. Kraig attended another tele-psych session with NP Pessefall. (Tr. 762.)  He reported that the year had not been going well as he had broken up with his girlfriend, and requested an antidepressant.  (Tr. 762, 774.)  His mood was described as "happy, then sad."  (Tr. 775.)  NP Pessefall titrated up Dr. Kraig's Lexapro, and otherwise continued his medications unchanged.  (*Id*.)  He again recommended grief therapy, and advised Dr. Kraig to return in three months.  (Tr. 776.)

### 2.      Opinion Evidence

### i.      Opinion of Plaintiff's Medical Provider

On October 7, 2019, Sandra Lavelle, PMHNP-BC, completed a mental medical source statement stating that she met with Dr. Kraig every two or three months for 20-30 minutes for treatment of generalized anxiety disorder; major depressive disorder; insomnia; and sedative abuse, early remission.  (Tr. 510.)  She identified clinical findings that demonstrated the severity of Dr. Kraig's mental impairments and symptoms, including: alert and oriented x4; proper dress and grooming; clear conversational communication without odd verbalizations; awareness of problems and consequences; continued anxiety; tearfulness; grief response; insomnia; and risk for relapse of sedative abuse.  (*Id*.)  NP Lavelle noted Dr. Kraig's "illness in all likeliness may be lifelong."  (*Id*.)

NP Lavelle opined Dr. Kraig was unable to meet competitive standards in his ability to:

- complete a normal workday and workweek without interruptions from psychologically based symptoms;

- perform at a consistent pace without an unreasonable number and length of rest periods;

- deal with normal work stress;

- understand and remember detailed instructions;

- carry out detailed instructions;

- set realistic goals or make plans independently of others; and

- deal with stress of semiskilled and skilled work.

(Tr. 511-12.)  She opined that Dr. Kraig was seriously limited, but not precluded in his ability to:

- remember work-like procedures;

- understand and remember very short and simple instructions;

- maintain attention for two hour segment;

- maintain regular attendance and be punctual within customary, usually strict tolerances;

- sustain an ordinary routine without special supervision;

- work in coordination with or proximity to others without being unduly distracted;

- accept instructions and respond appropriately to criticism from supervisors;

- get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes;

- respond appropriately to changes in a routine work setting; and

- be aware of normal hazards and take appropriate precautions.

(Tr. 511.)  She explained these limitations were based on her findings that Dr. Kraig experiences high anxiety, panic attacks, difficulty with memory, needs frequent re-iterations of instructions and is easily overwhelmed.  (*Id*.)  She also opined Dr. Kraig was at a high risk for relapse of sedative abuse, especially due to his recent sobriety.  (*Id*.)  She indicated that Dr. Kraig struggled with critical thinking, problem solving, memory and impaired concentration, and the skills need to perform semiskilled and skilled work tasks would be hampered by these symptoms.  (Tr. 512.)

8

NP Lavelle also opined that Dr. Kraig's impairments or treatment would cause "variable" absences from work, explaining "he may have difficulty as much as 3 times a week or more." (*Id*.)  She further opined that he would likely be off-task 70% of an eight-hour workday.  (*Id*.)

### ii.    State Agency Reviewers

On January 29, 2020, state agency reviewing psychologist Paul Tangeman, Ph.D. reviewed the record and opined that Dr. Kraig had mild limitation in understanding, remembering, or applying information; and mild limitation in concentrating, persisting, or maintaining pace.  (Tr. 71-72.)  Dr. Tangeman opined there was no severe impact on basic work activity.  (Tr. 72.)  On June 16, 2020, state agency reviewing psychologist Irma Johnston, Psy.D., reviewed the record and concurred with the opinion of Dr. Tangeman.  (Tr. 78-79.)

## C.    Hearing Testimony

### 1.    Plaintiff's Testimony

At the November 13, 2020 hearing, Dr. Kraig testified that was 65 years old, was widowed, and lived alone.  (Tr. 36-37.)  He was able to drive without restrictions.  (*Id*.)  He received Social Security benefits, and had collected benefits from his disability insurance policy until August 2019.  (Tr. 39.)

With regard to his prior work, he opened his dental practice in 1980 and worked as a dentist until September 2018.  (Tr. 37, 40.)  This work required him to stand 60% of the time and sit 40% of the time.  (Tr. 40.)  He did not have to lift more than five pounds.  (*Id*.)

He testified that he stopped working because his insomnia limited him to three or four hours of sleep per night, and that the sleep he did get was interrupted and "not great."  (Tr. 41, 50.)  He also testified that the combination of his antidepressant and anti-anxiety medications prevented him from practicing dentistry "to the level that [he] would like to perform it at," and

could put him at risk of committing malpractice.  (Tr. 42.)  He did not report any side effects or fatigue from his mental health medications.  (Tr. 50.)

He also testified that he had herniated discs as a result of forty years of leaning over patients.  (Tr. 43.)  He treated the back problem with steroids in the past, but was not receiving treatment at the time of the hearing because he limited his activities.  (Tr. 43.)  His back issue was "under control" and "doing okay" with periodic Tylenol and Motrin.  (*Id*.)  Recently, he reported lifting a 50-pound bag of ice melt, which irritated his back.  (Tr. 49.)

With regard to activities of daily living, Dr. Kraig testified that he was able to clean up after himself, and had a cleaning crew come clean his house bi-weekly for heavier cleaning.  (Tr. 43-44.)  He cared for his two dogs, did his own shopping, prepared his own food, and did his own laundry.  (Tr. 44.)  He took the dogs for a mile-long walk about twice per week.  (Tr. 47.)

On a typical day, he testified that he woke up, took his dogs for a walk, took care of his finances (including receipt of rents from commercial property he owned), and paid his bills.  (*Id*.)  He liked to play an hour of racquetball with friends when he could, and went to his daughter's house to watch his eight-month-old grandson while she taught autistic children from noon until 5:00 or 5:30 p.m.  (Tr. 44-46.)  His grandson weighed 20 pounds, and was "just starting to stand up and motor around."  (Tr. 45.)  This gave him a little bit of a workout, but he was able to lift and carry is grandson and enjoyed it.  (Tr. 46.)  He took his grandson for about an hour-long walk in a stroller when he could, but they went slowly.  (Tr. 47.)  He then came home to have a nice meal, and enjoyed reading.  (Tr. 45.)

### 2.    Vocational Expert's Testimony

A Vocational Expert ("VE") also testified.  (Tr. 51.)  The VE testified that the hypothetical individual of Dr. Kraig's age, education, and work background and the function

limitations described in the ALJ's RFC determination could perform Dr. Kraig's past work as a dentist (Tr. 61), and could also perform representative positions in the national economy, including store laborer, hang packager, or industrial cleaner (Tr. 62.)

He also testified that if an individual had memory and concentration issues, particularly in the afternoon, or lacked a license to practice dentistry, they could not perform Dr. Kraig's past work as a dentist.  (Tr. 54-55.)  Because dentistry skills are highly specialized, they would not transfer to any other occupation.  (Tr. 56-57.)  He testified that being unable to complete a normal workday without interruptions from psychological symptoms, including being on time, being productive throughout the work period, and staying of the duration of the work period, would preclude all work.  (Tr. 63.)

### III. Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.      If the claimant is doing substantial gainful activity, he is not disabled.

2.      If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520;[1] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

---

[1] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501, et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq.*, corresponding to the last two digits of the DIB cite (*i.e.*, 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

**IV. The ALJ's Decision**

In her November 24, 2020 decision, the ALJ made the following findings:[2]

1.      The claimant meets the insured status requirements of the Social Security Act through June 30, 2021.  (Tr. 14.)

2.      The claimant has not engaged in substantial gainful activity since September 12, 2018, the alleged onset date.  (*Id*.)

3.      The claimant has the following severe impairments: degenerative disc disease of the lumbar spine and somatic symptom and related disorders. (Tr. 15.)

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 18.)

5.      The claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except he can frequently climb ramps and stairs; occasionally climb ladders, ropes, and scaffolds; and be able to frequently stoop, kneel, crouch, and crawl.  (Tr. 19.)

6.      The claimant is unable to perform any past relevant work.  (Tr. 22.)

7.      The claimant was born in 1955 and was 63 years old, defined as an individual closely approaching retirement age, on the alleged disability onset date.  (Tr. 23)

8.      The claimant has at least a high school education.  (*Id*.)

9.      Transferability of job skills is not material to the determination of disability.  (*Id*.)

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including store laborer, hang packager, and industrial cleaner.  (Tr. 23-24.)

---

[2] The ALJ's findings are summarized.

Based on the foregoing, the ALJ determined that Dr. Kraig had not been under a disability, as defined in the Social Security Act, from September 12, 2018, through the date of the decision on November 24, 2020.  (Tr. 24.)

### V. Plaintiff's Arguments

In his Brief, Plaintiff asserts a single assignment of error:

> 1. The ALJ's mental RFC determination is unsupported by substantial evidence as she failed to properly evaluate the opinion of treating medical source Sandra Lavelle, PMHNP.  (ECF Doc. 9 p. 3.)

### VI. Law & Analysis

**A.      Standard of Review**

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992)); *see also Blakley*, 581 F.3d at 406.  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

"'The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Blakley*, 581 F.3d at 406 ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'") (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Even where an ALJ decision is supported by substantial evidence, the Sixth Circuit explains the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007); citing *Wilson v. Comm'r of Soc. Sec.* 378 F.3d 541, 546-547 (6th Cir. 2004)); *see also Rabbers*, 582 F.3d at 654 ("Generally, … we review decisions of administrative agencies for harmless error.").  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.**    **Assignment of Error: Whether ALJ Properly Evaluated Opinion of Treating Mental Health Provider Sandra Lavelle, PMHNP-BC**

In his sole assignment of error, Dr. Kraig asserts that the ALJ failed to properly evaluate the opinion of mental health provider NP Lavelle.  (ECF Doc. 9 p. 3, 9-11.)  The Commissioner argues in response that the ALJ reasonably considered NP Lavelle's opinion and sufficiently explained why she found the opinion to be "unpersuasive as inconsistent with the remainder of the record and unsupported by the treatment records."  (ECF Doc. 11 pp. 1, 9-13.)

The Social Security Administration's ("SSA") regulations for evaluation of medical opinion evidence in claims filed after March 27, 2017 apply in this case.  20 C.F.R. § 404.1520c. Those regulations provide that "administrative law judges will now evaluate the 'persuasiveness' of medical opinions by utilizing the five factors listed in paragraphs (c)(1) through (c)(5) of the regulation."  *Jones v. Comm'r of Soc. Sec.*, No. 3:19-CV-01102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020) (quoting *Gower v. Saul*, 2020 WL 1151069, at *4 (W.D. Ky, March 9, 2020) (citing 20 C.F.R. § 404.1520c(a) and (b)).

The five factors are supportability, consistency, relationship with the claimant, specialization, and other factors, with supportability and consistency acknowledged to be the most important factors for consideration.  20 C.F.R. § 404.1520c(c)(1)-(5); 20 C.F.R. § 404.1520c(b)(2).  While ALJs are required to explain how consistency and supportability were considered, they "may, but are not required to, explain how [they] considered the factors in paragraphs(c)(3) through (c)(5) of this section, as appropriate, when [they] articulate how [they] consider medical opinions and prior administrative medical findings in [a claimant's] case record."  20 C.F.R. § 404.1520c(b)(2).

Here, the ALJ determined that Dr. Kraig's mental health impairments were all non-severe at Step Three.  In support of this finding, she evaluated NP Lavelle's opinion as follows:

I also note the file contains a check-list form titled Mental Medical Source Statement from Sandra Lavelle, PMHNP, dated October 7, 2019, which I do not find persuasive (5F/5-8; 6F/2-5; 7F/53-56). On the check-box form Ms. Lavelle checked boxes opining the claimant was mostly "seriously limited, but not precluded" or "unable to meet competitive standards" in most areas of "mental abilities and aptitudes needed to do unskilled work" and checked boxes opining the claimant would be "unable to meet competitive standards" in all areas of "mental abilities and aptitudes needed to do semiskilled and skilled work" (6F/4). She also checked boxes opining the claimant was "limited but satisfactory" in areas of "mental abilities and aptitude needed to do particular types of jobs" (6F/4). She also opined that the claimant "may have difficulty as much as 3 times a week or more" in answer to a question about how often the claimant's impairments or treatment would cause absence from work; and opined the claimant would be off-task from performing job tasks 70% on average (6F/4). <u>I do not find these opinions to be persuasive</u>. Ms. Lavelle stated in a handwritten note that the claimant experienced high anxiety, panic attacks, difficulty with memory, is easily overwhelmed, and needed frequent re-iterations of instructions, however, <u>the treatment records do not support and are inconsistent with this note</u> (1F; 2F; 4F; 6F; 12F; 13F). <u>Instead, the treatment records note the claimant progressed in his mental health treatment, had unremarkable mental status examination findings during the relevant period, and he testified that he enjoyed cooking and reading</u> (1F; 2F; 6F; 12F; 13F; hearing testimony). <u>Overall, the treatment records are not consistent with the level of limitation in Ms. Lavelle's opinions and they are therefore not persuasive.</u>

(Tr. 18 (emphasis added).)

In arguing that this analysis was inadequate, Dr. Kraig first contends the ALJ did not adequately explain her evaluation of NP Lavelle's opinion because she made a "conclusory finding" that "the treatment records do not support and are inconsistent with" the opinion, but "failed to cite to any evidence to the contrary … and instead cited to the entirety of the record." (ECF Doc. 9 p. 9.)  Next, somewhat contradictorily, he acknowledges specific evidence that the ALJ described as contrary to NP Lavelle's opinion, but argues the ALJ's discussion of this evidence amounted to "a selective review of the record" and impermissible cherry-picking.  (*Id.* at p. 11.)  Each of these arguments will be addressed in turn below.

### 1.      Whether ALJ Adequately Explained Why Opinion Was Unpersuasive

Dr. Kraig argues that the ALJ erred when she "cited to the entirety of the record" in support of her finding that NP Lavelle's opinion was unpersuasive, instead of citing specific

evidence that was contrary to NP Lavelle's findings.  (*Id.* at p. 9.)  In support of this argument, he cites a recent decision finding the requirements for evaluating medical opinions still "require that the ALJ provide a coherent explanation of [her] reasoning."  (*Id.* (quoting *White v. Comm'r of Soc. Sec.,* No. 1:20-CV-00588, 2021 WL 858662, at *21 (N.D. Ohio Mar. 8, 2021).)

The Commissioner argues in response that the ALJ did not err in citing generally to the medical records because she had already discussed the evidence that was inconsistent with NP Lavell's findings "at length with pinpoint page cites" earlier in her decision.  (ECF Doc. 11 p. 11.)  Further, she contends that "a review of the exhibits cited shows that effectively every page of the mental health treatment records from November 2018 to August 2020 (i.e., Exhs. 2F, 4F, 12F and 13F) supports the ALJ's determination that NP Lavelle's extreme limitations were inconsistent with the record and unsupported by her own treatment records."  (*Id.*)

As a general matter, it was permissible for the ALJ to rely on previously articulated information to support her evaluation of NP Lavelle's opinion, and she was not required to rearticulate previous discussions to support her findings.  *See Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) ("No doubt, the ALJ did not reproduce the list of these treatment records a second time when she explained why Dr. Bell's opinion was inconsistent with this record. But it suffices that she listed them elsewhere in her opinion.") (citing *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014)); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006) (finding ALJ need not "spell out every fact a second time").

Here, before evaluating NP Lavelle's opinion, the ALJ provided a lengthy discussion of the mental health records in support of her Step Three finding that Dr. Kraig's mental health impairments were non-severe, as follows:

> The claimant was ordered to participate in treatment after being caught writing prescription Ambien for himself (1F/8). At a psychiatric evaluation on September

12, 2018, the claimant reported that he had never been in any kind of inpatient or outpatient treatment for mental health conditions prior to that time (1F/8). At that time, treatment records indicate he was consuming Ambien daily, taking about 10 mg a day – 5 at bedtime and another 5 when he woke up in the middle of the night (1F/8). He also reported that he took about 5 mg at a time for naps as well (1F/8). The claimant reported that he was not using any other substances at that time, and had no history of alcohol, cocaine, amphetamines, suboxone, methadone, opiates, or marijuana (1F/8).

The psychiatric evaluation records indicate the claimant had endured a series of traumatic events dating back to 2012 when, while on vacation, his wife suffered a cerebral hemorrhage and died (1F/8). Fifteen months later, he found a close friend after he committed suicide and in 2015, the claimant's brother succumbed to an aggressive form of oral cancer (1F/8). Treatment notes also indicate that his work as a dentist was very stressful and he suffered deep disappointment after his associate backed away from taking over ownership of the practice (1F/8). Additionally, the claimant's son had fallen into a depression in October 2017 related to a sudden divorce (1F/8). Treatment records also note the claimant "suffers from perfectionism, always feels he needs to be 'the strong one.' Prone to chronic worry" (1F/8). <u>Mental status examination was unremarkable in September 2018</u>, and the psychiatric evaluation noted the claimant was a middle-aged man caught in a conflict, likely leading to insomnia and self-prescribing Ambien (1F/8-9).

The claimant was admitted for inpatient treatment from September 12, 2018 and discharged on October 10, 2018 after completing detoxification from Ambien (1F/10; 4F/2). He was referred by the Ohio State Dental Board as he was under a step I consent agreement with the Board (1F/10). <u>The discharge summary noted that the claimant responded favorably to treatment efforts as evidenced by improvement in his overall level of functioning via his group attendance and participation, lecture and 12-step meeting attendance, and his cooperation with staff and the treatment program</u> (1F/10). The claimant shared openly in group, completed all of his assignments, and worked at being of assistance to peers (1F/10). He verbalized a willingness to continue his chemical dependency treatment at a lower level of care and AA/NA meeting as recommended, and was instructed to do his intensive outpatient program and aftercare at Southwest General in Akron to be in compliance with his consent agreement (1F/10). He also followed up for medication management services to manage his symptoms of depression, anxiety, and sleep issues to improve his quality of life in November 2018 (4F/2).

<u>The claimant completed intensive outpatient treatment through Southwest General from November 1, 2018 through discharge on November 30, 2018</u> (2F/2; 3F/37-64). <u>He participated in cognitive group therapy and was attentive, engaged, and participated appropriately</u> (2F). <u>The claimant also attended and completed continuing care group therapy for substance abuse in December 2018, including group psychotherapy sessions</u> (3F/20).

19

He also followed up for medication management services to manage his symptoms of depression, anxiety, and sleep issues to improve his quality of life in November 2018 (4F/2). He reported in December 2018 that he sold his dental practice and stated he felt like his anxiety will hopefully decrease, but also reported stressors including blending his family and stress from the board of dentistry and selling his house (4F/13). The claimant reported that the antidepressant was working fine but showed lack of insight into his dependency in a sleep aide, and denied any anxiety, suicidal or homicidal ideation, and reported stable appetite and weight (4F/13-14, 19). Treatment records noted that he was open and cooperative and verbalized awareness of problems, consequences, and causes; had good judgment; had ability to attend and maintain focus with regard to attention/concentration; and was reflective and able to resist urges (4F/16).

At a medication management follow up on March 8, 2019, the claimant reported his mood had been "very good" and reported he had been enjoying retirement since selling his dental practice (4F/21; 10F/33). The claimant reported that he was doing the steps necessary to get reinstated with his dentist license but was not sure he wanted to practice anymore (4F/21). He reported that his family was supportive and he felt he was in a good place after being on medication for six months (4F/21; 10F/33). Mental status exam findings were unremarkable and his medications were continued as prescribed (4F/21-27; 10F/33-35). In May 2019, the claimant's medications were adjusted and increased for insomnia and anxiety symptoms (4F/28-35). At a follow up in June 2019, he reported doing well and that his sleep was good and his anxiety was under control with prescribed medication (4F/36; 12F/19-25). In September 2019, the claimant reported that he was doing well and "staying active" and was taking a full Lexapro in the morning (7F/36; 10F/56-63; 12F/27-34).

Mental status examination findings were generally unremarkable during the relevant period. Findings from mental status examinations noted he appeared alert; with appropriate affect; had good eye contact; speech was clear and conversational; recent and remote memory appeared normal; psychomotor activity was normal; his attitude was described as open and cooperative; judgment was good; he demonstrated ability to attend and maintain focus; and reported anxiety was "not too bad" (10F/6, 23; 12F).

(Tr. 16-17 (emphasis added).)

Focusing on the ALJ's subsequent analysis of NP Lavelle's opinion, the ALJ made the following specific findings regarding the supportability and consistency of those findings:

Ms. Lavelle stated in a handwritten note that the claimant experienced high anxiety, panic attacks, difficulty with memory, is easily overwhelmed, and needed frequent re-iterations of instructions, however, the treatment records do not support and are inconsistent with this note (1F; 2F; 4F; 6F; 12F; 13F). Instead, the treatment records

> note the claimant progressed in his mental health treatment, had unremarkable mental status examination findings during the relevant period, and he testified that he enjoyed cooking and reading (1F; 2F; 6F; 12F; 13F; hearing testimony).

(Tr. 18 (emphasis added).)  In other words, the ALJ found that NP Lavelle's description of

significant mental limitations was at odds with how Dr. Kraig "progressed in his mental health

treatment," with his "unremarkable mental status examination findings," and with his testimony

regarding his activities of daily living (like cooking and reading).  (*Id.*)  While the ALJ cited

generally to the record in support of these observations, his prior discussion of the record

contained more specific discussion and citations regarding the records supporting his findings.

Specifically, with respect to the observation that how Dr. Kraig "progressed in his mental

health treatment" did not support and was inconsistent with NP Lavelle's findings (Tr. 18), the

ALJ had already explained – as highlighted in the underlined portions above – that Dr. Kraig

"responded favorably to treatment efforts" during inpatient treatment, completed outpatient

treatment and group therapy for substance abuse, followed up with medication management

beginning in November 2018, reported "he was in a good place after being on medication for six

months," reported "his anxiety was under control with prescribed medication" in June 2019, and

"reported that he was doing well and 'staying active'" in September 2019.  (Tr. 16-17.)

Next, with respect to the ALJ's observation that Dr. Kraig's "unremarkable mental status

examination findings" did not support and were inconsistent with NP Lavelle's findings (Tr. 18),

the ALJ had already noted – as highlighted in the underlined portions above – that Dr. Kraig had

unremarkable and/or normal mental status findings in September 2018, December 2018, and

March 2019, as well as "during the relevant period" with citations to examination findings in

December 2019, January 2020, and various examination findings from March 2019 through

March 2020.  (*See* Tr. 16-17 (citing 1F/8-9 (Tr. 237-38), 4F/16 (Tr. 381), 4F/21-27 (Tr. 386-92),

10F/33-35 (Tr. 627-29), 10F/6 (Tr. 600), 10F/23 (Tr. 617), 12F (Tr. 692-761).)

21

Finally, with respect to the ALJ's observation that Dr. Kraig's testimony (that he enjoyed cooking and reading) did not support and was inconsistent with NP Lavelle's findings (Tr. 18), the ALJ had already made the following observations in support of her finding that Dr. Kraig had no more than mild limitations in his ability to concentrate, persist, or maintain pace:

> The claimant contended that he has limitations in concentrating generally and focusing generally. On the other hand, the claimant said that he is also able to drive, prepare meals, watch TV, read, manage funds, and handle his own medical care and financial affairs (hearing testimony).

(Tr. 15.)

Considering the record and the ALJ decision as a whole, the undersigned concludes that the ALJ adequately articulated her grounds for finding NP Lavelle's opinion was not supported by her own records (supportability) or consistent with evidence from other sources (consistency). *See* 20 C.F.R. § 416.920c(c)(1)-(2).  Although the ALJ provided only general record citations in the opinion discussion itself, she nevertheless described specific record findings and testimony that she found to be inconsistent with NP Lavelle's opinion, and had already provided a more thorough discussion of those same records and testimony earlier in her Step Three analysis.  This was sufficient to "build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F.Supp.2d at 877.

For the reasons stated, the undersigned finds that Dr. Kraig has failed to demonstrate that the ALJ's analysis was "inadequate under the regulations and case law."  (ECF Doc. 9 p. 9.)

### 2.    Whether ALJ Considered Only Selective Records

In his second argument, Dr. Kraig asserts that the ALJ engaged in a "selective review of the record" when she noted that his treatment progress and unremarkable mental status findings did not support and were inconsistent with the limitations NP Lavelle described.  (ECF Doc. 9 p. 10.)  The Commissioner disagrees, arguing that "[t]he ALJ discussed all of the mental health

evidence from Plaintiff's September 2018 alleged onset date forward," including the specific evidence referenced in Dr. Kraig's brief.  (ECF Doc. 11 pp. 11-12.)

The Sixth Circuit has emphasized "that all determinations [must] be made based upon the record in its entirety."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007) (citing *Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984)).  The *Rogers* court explained: "This requirement that determinations be made in light of the record as a whole helps to ensure that the focus in evaluating an application does not unduly concentrate on one single aspect of the claimant's history."  *Rogers*, 486 F.3d at 249.

Nevertheless, it is well-established that an ALJ is not "required to discuss each piece of data in [her] opinion, so long as [she] consider[s] the evidence as a whole and reach[es] a reasoned conclusion."  *Boseley v. Comm'r of Soc. Sec.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507–08 (6th Cir. 2006) (per curiam)); *see also Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004) (noting a "failure to discuss … observations does not indicate that they were not considered" and "[a]n ALJ need not discuss every piece of evidence in the record for his decision to stand").

In support of his argument that the ALJ improperly relied on a "selective review of the record," Dr. Kraig cites to the following records and findings: (1) a September 12, 2018 psychiatric evaluation by Dr. Primc which noted Dr. Kraig's history of trauma, reported symptoms, examination findings, and diagnoses (ECF Doc. 9 p. 10 (citing Tr. 237-38)); (2) NP Kendig's observation of moderate symptoms in November 2018 (*id.* (Tr. 373)); (3) NP Lavelle's observation of moderate symptoms and a self-report of frequent wakefulness in June 2019 (*id.* (citing Tr. 441-42)); and (4) NP Lavelle's indication of moderate impairments in functioning in September 2019 (*id.* (citing Tr. 450).

A review of the ALJ's Step Three analysis reveals that she specifically discussed Dr. Primc's psychiatric evaluation records at length, including outlining Dr. Kraig's reported trauma history and symptoms, and accurately describing his mental status examination findings as "unremarkable."  (Tr. 16 (citing Tr. 237-38).)  While the ALJ did not discuss every specific finding noted in Dr. Kraig's brief, she was not required to do so, and Dr. Kraig has not identified any material omission or mischaracterization in the ALJ's discussion of this medical record.

As to the records of NP Kendig and NP Lavelle which list certain "moderate" symptoms and "moderate" functional limitations, Dr. Kraig argues that "[t]his probative evidence is consistent with NP Lavelle's opinion."  (ECF Doc. 9 p. 11.)  On the contrary, the ALJ accurately observed that NP Lavelle had "checked boxes opining the claimant was mostly 'seriously limited, but not precluded' or 'unable to meet competitive standards' in most areas of 'mental abilities and aptitudes needed to do unskilled work' and checked boxes opining the claimant would be 'unable to meet competitive standards' in all areas of 'mental abilities and aptitudes needed to do semiskilled and skilled work.'"  (Tr. 18 (citing Tr. 512).)  There are very few limitations outlined in NP Lavelle's opinion that could be characterized as "moderate."

Moreover, while the ALJ did not specifically discuss the lists of "moderate" symptoms and functional limitations contained in the medication management records for NP Kendig and NP Lavelle, it is clear from the ALJ's Step Three analysis that she generally reviewed and considered Dr. Kraig's medication management records as a whole.  (Tr. 17.)  More importantly, the "moderate" findings highlighted by Dr. Kraig do not conflict with the ALJ's ultimate finding that "the treatment records are not consistent with the level of limitation in [NP] Lavelle's opinions."  (Tr. 18.)

As to Dr. Kraig's observation that he reported to his provider in June 2019 that he was waking "at least 9 times during the night" (ECF Doc. 9 p. 11), the Commissioner accurately observes that the record actually reflects that he reported that he gets up "at least *one* time a night" (ECF Doc. 11 p. 12 (citing Tr. 441) (emphasis in original).)  Moreover, a review of the ALJ decision reflects that she acknowledged Dr. Kraig's history of insomnia and self-prescribing Ambien, as well as the improvement of these conditions with treatment.  (Tr. 16-17.)

As noted above, the ALJ need not discuss every finding in the record to demonstrate that she considered the record as a whole.  *Boseley*, 397 F. App'x at 199; *Thacker*, 99 F. App'x at 665.  Here, Dr. Kraig has not met his burden to demonstrate that the ALJ improperly omitted or mischaracterized material evidence relevant to her evaluation of NP Lavelle's opinion.  As discussed in the prior section, the ALJ found NP Lavelle's opinion to be inconsistent with Dr. Kraig's treatment progress, unremarkable mental status examination findings, and reported activities of daily living.  That finding was supported by substantial evidence in the record.

Dr. Kraig's argument that provider lists of "moderate" symptoms and limitations are consistent with the significant limitations outlined in NP Lavelle's opinion, even if it were found to be supportable, ultimately amounts to an argument that the records support greater limitations than those found by the ALJ.  Regardless, "'[t]he substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'"  *Blakley*, 581 F.3d at 406 (quoting *Mullen*, 800 F.2d at 545).  That means this Court cannot overturn the ALJ's decision "so long as substantial evidence also supports the conclusion reached by the ALJ," regardless of whether substantial evidence – or even a preponderance of evidence – supports Dr. Kraig's more restrictive reading of the evidence.  *Jones*, 336 F.3d at 477; *see also Blakley*, 581 F.3d at 406.

Here, for the reasons specified above, the undersigned finds that the ALJ's evaluation of NP Lavelle's opinion was consistent with the regulatory requirements and supported by substantial evidence from the record as a whole.  Dr. Kraig certainly has not met his burden to demonstrate otherwise.  Accordingly, the undersigned finds Dr. Kraig's sole assignment of error to be without merit.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.

July 13, 2022

*/s/Amanda M. Knapp*

_____
AMANDA M. KNAPP
United States Magistrate Judge

## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).